Excuse me. Good morning, Your Honors. I'm Rachel Brill. I am counsel for the appellant I would like to provide a very brief factual background of some points that underlie just about all of the legal claims. And sort of just set the stage very briefly. Preferred Medical Equipment, sometimes we call it Preferred, was a durable medical equipment supplier. Luce Vega, the appellant, started that company around 2008, but it was not up and running until April 30, 2010, and it was shut down on April, the end of April, 2011. The way that durable medical equipment and Medicare worked together is that order, and in Preferred's case, is that orders for the equipment would come from coordinators, and important documents like certificates of medical necessity and prescriptions would come and be prepared by doctors. If those papers were in order, and if the patient was a Medicare beneficiary, then Luce Vega, my client, as the head of the company, would order the equipment, pay for the equipment, arrange for the delivery of the equipment. The coordinators, based on those orders, would be paid a commission. And then Medicare, after all that took place, and the delivery took place, Medicare would be billed. And for that, Luce Vega had the assistance of her secretary and a third-party billing company. Counsel, is it common to have coordinators as intermediaries between a doctor and a provider? I mean, speaking from the evidence of this case, it certainly was, Your Honor. There's a company called Preferred, that's the company that was in this case. I understand. There was another company that's referred to as Montemar. That company had several coordinators. Why is there a need for, you have doctors who have patients, doctors decide a patient needs something in the way of equipment, and then there are companies that have the equipment to provide them. Why is there a need for an intermediary, like a coordinator, to facilitate the transaction? I mean, your question was whether it was common, and this case is pervaded with it. With respect to whether there's a need, I don't, I mean, unless the person can't leave their house and then there's still no need for an intermediary with the doctor, there's, I can't, the evidence doesn't show any need, and I can't think of any need. But whether that was the common practice, and speaking about the mindset of somebody running a company, from the evidence in this case, and possibly from the evidence of other cases that have made their way up to the Court of Appeals, certainly ones that I've been involved in, it's certainly a common practice to have the coordinators out there compiling the paperwork, sort of like, well, in Spanish the word is head stores, but But it's the involvement of coordinators in this case, and the way in which they were compensated that created a lot of the legal problems, the criminal law issues in this case. Isn't that so? The way that these coordinators were paid caused a lot of problems in this case. If the coordinators had been actual employees and not paid by commission, they arguably would have caused fewer problems than those that were caused in the case. So there's not a prohibition on these middle people taking care of the paperwork, making things simpler for people that needed medical equipment, who, you know, aren't in a position to fill out all the paperwork, making things simpler for doctors who traditionally, you know, stereotypically don't like to fill out all the paperwork. There's a way for these people, these middle people to be useful, but the commission aspect certainly raised issues, raised criminal issues in this case. Just one last factual point to make, and that is that nothing about the paperwork, the Certificates of Medical Necessity, in particular, indicated that the patient had not actually been seen by a doctor, or that something about that medical necessity was false. And the only thing that got to Ms. Vega was the paperwork. I want to address first the... Some of the paperwork didn't have doctor's certificates in them. One of the co-conspirators testified that he came in and did a clean-up operation to fill in all of the missing information and to essentially falsify the documents. So if a package would be prepared by a coordinator, let's say for a wheelchair, let's just keep it simple, and that package would include what the coordinator understood was sufficient for Luce Vega to order, pay for, and deliver the wheelchair. Then Luce Vega would bill Medicare for that wheelchair. And what was happening was that Medicare was either... When Medicare was not paying because of some missing paperwork, that is when the doctor was called in. And again, the middle person was used. There was a need to... I mean, one interpretation is the one that you just said, to clean things up, but the other interpretation was to provide the paperwork that had not... That had mistakenly not been provided in the first place. But what is supposed to be provided, what Medicare is supposed to receive is a certificate of medical necessity that states that this person is not able to walk and in need of this particular kind of wheelchair. But when the doctor, that doctor left your client with those blank forms with his name on it, I mean, that certainly gives Raz the inferences of her knowledge of what's going on. At this stage, Your Honor, it absolutely does. But that took place, by all accounts, in December of 2010. Remember, the operations were from April of 2010 to April of 2011. And that visit and those inferences, and again, I am, as you are, basing everything that I'm saying and everything that you're asking on the record, that all of that took place in December of 2010. And at that moment, one could make not even a very many series of inferences to say that something inappropriate was going on at that time. But even before that, weren't these coordinators interfacing with the doctor and there was a basis for your client knowing that many of these individuals for whom the equipment was being ordered were never even seen by the doctor? I mean, the fact that she hadn't actually met him at her office, how significant is that? I mean, she knew of his involvement even before that important visit in December. Isn't that so? Well, Your Honor, that is a critical question. The answer is almost everything that I can answer. You said the answer would be yes, that's so, but there's one aspect that isn't, and that's the, you said that the coordinators were interfacing with the doctor. The coordinator in this case, it was a coordinator named Lisette, and it was a doctor named Dr. Garastegui, and she would, and had for years, and did in connection with that other much more massive fraud case, the Montemar case, interface with the doctor. But the issue on appeal, the issue at the trial is Luz Vegas, knowledge, knowing participation in that, and I want to refer the court, and with the court's indulgence, read to the court the two critical pages of the transcript there referred, they're referenced several times by the government to make the assertion that you just made, Judge Lopez, and that's at the appendix pages 1320 to 1321, and it's a question by the prosecutor to Lisette, the coordinator. You stated that you met Dr. Garastegui before. Was it at Montemar? Correct. Did you ever take Dr. Garastegui to Preferred Medical Equipment? Correct. I remember that took place in December. Do you remember when did you take him to Preferred? Well, I took him over around 2010, it became clear to me that Luz Vegas informed me that she received some information from Medicare in which they were requiring her to complete information that she did not have, documents that she did not have, and because she needed to fill out the information, she needed Dr. Garastegui to complete that information for her. Did you make Luz Vegas aware that Garastegui saw patients sometimes and sometimes he did not? So critical fact there, Garastegui saw some of the patients and did not see others of the patients. Correct. When? Since I started working, when I took over the prescriptions and some CMNs, Certificates of Medical Necessities. I told Ms. Vega that she should make copies of them and send them to Dr. Garastegui because some of those patients had not been seen by him, that he had been informed that he would go by and see them later on. I should have said at the start of all this, there is a series of direct questions but the time period, there is a mixture of all the time periods here. So you knew, question, that you were being paid for equipment that had been provided to Medicare beneficiaries that had actually never been seen by a physician. You, the coordinator knew. Correct. And you still received payment for it. Correct. And Luz Vega was aware of that. Correct. Did you know this was illegal? Yes. Did you ever tell Luz Vega that this was illegal? I don't remember, but she must have known. Why? Because since she's the owner, she must know what should be done and what should not be done. That's the entirety of the testimony. It shouldn't be taken out of context. It should be read in context and in context. There is a mixture of the time periods and what you can get is, she must have known. Garastegui saw some, but not all. And that's corroborated by another cooperator, Marco Sarraga, who says Garastegui saw some, but not all. And it's corroborated by Dr. Garastegui who says the only time that he actually interfaces with Luz Vega is in December and he makes it clear in December that he's doing something illegal and he's paid for it. I bring, I appreciate the question. Excuse me, counsel. Give me your focus on this time frame. I gather there is a concession that from that time forward, December of 2010 going forward, there's no challenge to the sufficiency of the evidence after that point, but you're focusing on sufficiency challenges in terms of her knowledge earlier in time. Is that correct? How many counts does that affect? Well, it affects a lot, well, in the brief, it really affects the aggravated identity theft counts and to some extent the money laundering counts. There are two money laundering counts, but the aggravated identity theft counts are the most important affected by this point. And those are counts 26, 27, and 28. And if I may just expand on my answer a little bit, Your Honor, count 28 is a claim that was made on May 7th. Remember, operations began on April 30th. So we're talking about one week after the, and it was paid 10 days later on May 17th. And it is now alleged that that was a part of this fraud and therefore knowingly using Juan Quiles's Medicare provider number or Medicare recipient number, she committed aggravated identity theft. Count 27 claim was made on August 17th, paid two days later on August 19th. Count 26 claim was made on September 21st, paid three days later on September 24th. All of these claims were made months before December and one of them was made at the very beginning of operation. So, again... Medical equipment told Vega they didn't want it and that was during the time frame which you're arguing there's no evidence? There are three people that are a part of the aggravated identity claim. The one from September, Jose Figueroa, his wife testified that she called and she spoke to someone who identified herself as Luz Vega, said, we don't want it, and it was picked up. And there's some allegation in the brief... We don't want it, we don't need it. We don't want it, we don't need it. We don't want it, we don't need it, we never should have had it. So, there's evidence? Well, okay, first of all, speaking, two parts to an answer to that assertion, Your Honor. One is that the claim, Jose Figueroa's claim was made by, claim to Medicare was made by him, presumably after three days after the claim was made. Anyway, there's no proof as to when the phone call was made. There was $717,000 worth of billing to Medicare in that one year. And so, a phone call from somebody who said, I received something that I don't need and I don't want, come take it away, is not evidence of knowledge of a large-scale Medicare fraud. I mean, and certainly not sufficient knowledge for the aggravated identity theft claim, which requires that you are knowingly using somebody's identity to, in order to get, in order to make a claim and be paid by Medicare. It's a serious and specific count. It takes place on specific dates. It's not an on or about kind of count, and it requires specific knowledge. So if the court is correct, Your Honor is very correct to talk about the evidence, but this, when you talk, when you talk about it, you also need to focus on the specificity of the evidence. And there is simply an, on the 21st of September, which is the last of them, that particular person that called and claimed to have spoken to Luz Vega, that particular person, claim was the last of them, which was filed on September 21st. So that's the, I hope, the answer to the court's question. Thank you. Mr. Ramirez, good morning. Good morning, Your Honors. May it please the Court? This is United States Attorney Hector Ramirez on behalf of the United States of America. Your Honors, I'd like to address the issue of the aggravated identity theft that counsel was bringing up to the Court. This is much more, the fraud is much more than just knowing that Dr. Garrastegui saw or did not see any patients. The fact that the claim, for example, of September 21st was paid three days later, that does not mean that the fraud started on that date. The medical records presented at trial showed that the equipment was actually delivered on August 20th, after she had called and informed that she did not need that equipment, that she did not want it. She did not have the facilities at home to have it. And her husband, she also testified, did not have the medical conditions that warranted some of that equipment. Notwithstanding that the equipment was taken to her home on August 20th, Medicare was billed on the 21st of September and subsequently paid on the 24th. So there is some timeframe in between the time in which the coordinator visited the beneficiary, the equipment was actually delivered, and the claim was submitted to Medicare for payment. So I would say that the jury could have easily inferred that this took place before the billing actually was sent to Medicare. Furthermore, Lisette Acevedo testified that by March of 2010 she had informed Luz Vega upon their agreement that Garzasegui did not see all of his patients. And this should have raised the red flag to Ms. Luz Vega. The fact is that when she started billing Medicare for these patients, she was submitting the bills to Medicare without the underlying documentation. That's what prompted Medicare to call Luz Vega to provide the information that had been billing, because there had already been warnings. By July of 2010, Ms. Luz Vega had already received a warning from Medicare that a patient by the name of David Caban Lopez had called that he did not need or want the equipment, and that there was an overpayment owed to Medicare. Prior to that, she had informed Lisette Acevedo around May of 2010 that for one of the aggravated identity theft patients, Efrain Toro Morales, that she needed to split the equipment into different prescriptions and different dates, because it was too much to bill Medicare in one single instance. So that's another red flag that shows a knowledge of fraud in this case. Furthermore … Counsel, excuse me. All of these requests for reimbursement had to be supported by a certificate of medical necessity, is that correct? That is correct in theory, but it doesn't have to be submitted to Medicare at the time of billing. You're supposed to keep it in the Medicare file of that beneficiary in the company, but you don't have to submit it when you submit the bill to Medicare. Were all of these requests, whether preserved in the way you suggest or actually forwarded to Medicare, were they all signed by the same doctor? Was he the only doctor involved? He was the only doctor involved in these charges that were brought in the indictment. And the thing is that by December when she called in Dr. Garrastegui to fix the documents, one important fact is that she did not call Dr. Garrastegui to tell him, listen doctor, can you come to Preferred Medical Equipment with the medical records that you have of these beneficiaries in your file so you can supplement my information that I need to send to Medicare? No, the testimony at trial was that she called him in, she paid him $1,000, he told him that it was illegal, and she provided him the information that she needed for those files because she had already met with one of her coordinators, Dr. Roberto Martinez, who had advised her that she needed to cure those defects. So she called in Dr. Garrastegui and actually gave him the information. So that's corroboration that she knew all along that these patients had not been seen by Dr. Garrastegui because otherwise she would have said, doctor, please bring in your medical files so we can supplement. So you're saying that testimony should be enough in and of itself for us to infer that as early as March or April of 2010 she was aware, she had knowledge? Definitely if you take into conjunction what Luz Vega had told her at the beginning, if you take into conjunction the fact that she had created at the beginning of this hiring relationship between Luz Vega and Lisa Acevedo, that she created a point system sheet where she was going to pay the coordinators, and then after she paid the coordinators there was testimony that she destroyed the sheets. The jury could have easily inferred as well that being a certified public accountant, certified public accountants do not destroy documents, they keep documents. And this was testimony that was offered by some of the cooperators at trial. Furthermore, the way these claims were being paid to the coordinators was based on the type of equipment. So for example, she would request Lisa Acevedo, and that was testimony at trial, please bring in electronic wheelchairs because Medicare would pay her $5,000 for it. And that's the highest paid equipment. She would also tell the coordinators and she would bill Medicare for inconsistent equipment. For example, she would bill for a patient a gel mattress when the patient did not have any ulcers. She would bill a patient for an electronic wheelchair and then also give her a standing roller to walk. Ms. Luz Vega, there was testimony at trial that she was well aware of the local coverage determinations when she filled out the Medicare enrollment application. The local coverage determination tells the company what she can bill and what is consistent and inconsistent in these billings. And she did it from the beginning. So she was well aware that when she was billing for a gel mattress, it's supposed to be for a bedridden patient that has ulcers in the back, not for a patient that can stand up or move onto a wheelchair and operate a wheelchair, not for a patient that has a back brace. And the fact is that the evidence that was presented before the jury was that for all these beneficiaries that were taken into consideration for the indictment, she billed the same combo of equipment with the same doctor, with the same coordinator. She gave them all electronic wheelchairs. She gave them all electronic beds. She gave them all gel mattresses, back braces, knee braces, the whole combination when she very well knew from the beginning of starting into that Medicare program that that couldn't be billed consistently with each other. So there was sufficient evidence of her knowledge from the beginning that this was a fraud scheme. Furthermore, there was another beneficiary in May or June of 2010 that she visited personally, and it was Felix Batista. Felix Batista testified at trial and he testified that he had preferred Medicare equipment to inform that he did not request or need that equipment. And it was actually delivered by Luz Vega's husband to his house. The fact is that shortly thereafter, and it was in the summer of 2010, Luz Vega appeared to his house and he had told her, I didn't request this equipment, I don't need this equipment, and she said, too bad, Medicare already paid for it, it's yours. Counsel, there are these two money laundering convictions which Appellant is challenging. What is the, in relation to the visit to the preferred offices by the doctor, what is the time frame of those money laundering transactions, which depend upon her knowledge that the proceeds that she's drawing upon were derived in a criminal fashion? What is the time frame of those two charges? Even if we would take into consideration the December visit of Dr. Garjastegui for the sake of the argument, she would have still had knowledge of the money laundering offense right then and there, because Dr. Garjastegui came in the beginning or middle of 2010. The transactions are December 27th, if I'm not mistaken, and January 13th of 2011. And the fact is that there was sufficient evidence at trial to prove the de minimis effect in the interstate commerce. The fact that the federal government paid those monies in and of itself provides a de minimis nexus in the interstate commerce. The fact that what I had mentioned before as to the aggravated identity theft counts, her knowledge of the fraud from the beginning, that needs to be taken into consideration for purposes of the money laundering count as well. There are references in the briefs to Medicare. It's like an honor system. It relies, that's a little bit of unsettling fact, if we're relying on simply the honor and good faith of those who are participating in the system. What exactly does that mean? It is, and unfortunately it is that way. Medicare does not have the resources, and that was testified at trial, to examine and audit every single claim that is sent. They get millions of claims on a yearly basis, and they only have the manpower to audit and examine a couple of those, and only when they do spot checks to determine that there is some foul play, like for example the inconsistent medical equipment being built in conjunction with each other, that's when Medicare gets some alert. The fact is that there was testimony at trial that Luz Vega only wanted to build traditional Medicare. She did not want the coordinators to bring her any other equipment for any other health care plan that was not traditional Medicare. The theory being that it's easier to defraud Medicare than other types of programs? That is correct, Your Honor. Was this scheme detected through a routine audit, or how did it first come to the attention of the authorities? This scheme was first detected because Luz Vega started receiving notices from Medicare that, for example, the July 2010 notice that David Caban Lopez did not need the equipment and there was an overpayment, she started getting letters for overpayment. Medicare started noticing that there was inconsistent equipment being built together for these beneficiaries and in a large volume. I mean, she paid Luz Vega nearly $100,000 in an eight-month period. That should have alerted her from the beginning that this was fraud. That is just too much money to pay one person for referrals. Her own witness, Dr. Roberto Martinez, testified that that practice of going out with coordinators to bring in patients that never solicited the equipment is soliciting and it was illegal. That was testimony at trial as well. So basically once Medicare started noticing that these equipments were inconsistent, they have some carriers that do the due diligence for them to investigate the claims and they receive. Could you just pin down for me what the role of these, is there a legitimate role for coordinators or is that in and of itself an unlawful Medicaid practice? That is unlawful in and of itself. Is it unlawful because of this commission, which you deem a kickback? By other means, too, because it is unlawful for the company to go and solicit unwanted equipment. That lures this type of scheme and it lures people to come in and bring beneficiaries that had not visited a doctor, did not need the equipment, to go and offer them this equipment. The fact is that the law allows for a company to have employees, full-time employees as well, not paid on a fee basis, depending on the type of equipment that they are bringing to the company, because that is clearly a kickback. The thing is that their own witness testified that this practice of soliciting was illegal. That was Roberto Martinez. And also the fact is that you cannot have this, the way it is supposed to be done, and that was testified specifically by her witness, Roberto Martinez, was that the patient visits a doctor, his primary physician, and the primary physician determines you have a need for a certain equipment. And that primary physician refers the patient with a prescription to get that equipment and the patient has the liberty to go to any of the other durable medical equipment companies to get that equipment from. It's not supposed to be the other way around. The way that they were doing it was that they were going to these patients and they were telling them, you know what, Medicare is not going to offer this anymore, so you may as well have it. And one example at trial was a patient, Felix Batista. He was offered a wheelchair, an electronic wheelchair, at the time that he did not need. And he requested Luz Vega to retrieve it. She never retrieved it because she said that Medicare had already paid for it. At the time of trial, he had a leg amputation and he did not have an electric wheelchair because the battery was dead on it. When he called Medicare, Medicare told him, you cannot have one for five years because we already gave you one. So that's the problem that this presents and that was testimony at trial. So I believe, Your Honor, that there was sufficient evidence at trial of her direct knowledge of this fraud scheme and the convictions were proper. If there's no further questions from the Court, we would like to rest on the briefs on the rest of the arguments. Thank you. Thank you, Your Honor.